IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| United States of America, | ) | |
| Plaintiff, | ) ) ) | No. 18-cr-688 |
| v. | ) ) | Judge John J. Tharp, Jr. |
| Luis Garcia, | ) ) ) | |
| Defendant. | ) ) | |

## MEMORANDUM OPINION AND ORDER

Following a week-long trial, a jury found Luis Garcia guilty of both counts charged in the indictment: conspiracy to possess with intent to distribute one kilogram or more of a mixture and substance containing heroin and 50 grams or more of methamphetamine, and possession with intent to distribute these substances. Garcia has moved for a new trial pursuant to Rule 33. His sole argument is that his Sixth Amendment right to a jury trial was violated because the jury engaged in improper discussion of the case before retiring for deliberation, and that its swift return of a verdict similarly casts doubt on the integrity of their deliberations. For the reasons discussed below, the Court denies his motion for a new trial.

## BACKGROUND

In view of the jury's verdicts, the facts are presented in the light most favorable to the government. *See, e.g., United States v. Conley*, 875 F.3d 391, 395 (7th Cir. 2017). Throughout Luis Garcia's jury trial, from April 12 to April 16, 2021, the government presented evidence regarding the defendant's involvement as a "local facilitator" in a scheme to transport drugs by bus from Mexico to the Chicago area. Trial Tr. Vol. 2, 309:3-9. Garcia was the man on the ground providing logistical support by, among other things, securing a garage for the bus loaded with

contraband, purchasing items for co-conspirators tasked with unloading drugs and selling them, and coordinating co-conspirators' efforts to evade detection when they feared the authorities were closing in on them.

The jury heard testimony from two cooperating co-conspirators who described Garcia's contributions to the scheme. Fransisco Navarro, the owner of Navarro's Truck Wash in Cicero, IL, testified that an acquaintance called in 2017 to say that someone would come visit him regarding a shipment of drugs that would be arriving from Mexico. That same day, the defendant, known by the nickname Polivoz, called Navarro. About an hour later, the defendant came in person and told Navarro he would be paid well for allowing a bus to park in his garage for the night. Moments later, Navarro heard Garcia giving directions over the phone to the people on the bus. After Garcia waved the bus into Navarro's Truck Wash and had a discussion with its occupants, Navarro gave him the only key to his garage. While the bus was inside, Garcia maintained control over access to the garage. As the bus lingered at Navarro's Truck Wash two days longer than expected, one of Navarro's clients called and asked to access a vehicle he had paid to store there. Garcia initially refused Navarro entry to his own garage because, according to Garcia, the area was hot and the police were everywhere. Nonetheless, Navarro went to his garage, received the key from Garcia, extracted his customer's car, and returned the key to Garcia. Days later, the bus was removed from Navarro's Truck Wash.

Luis Espindola, whose job it was to accompany the bus to its destination, disassemble its interior to remove the hidden drugs from secret compartments, and distribute them to local buyers, also testified about Garcia's involvement in the conspiracy. He explained that a senior figure in the drug trafficking organization, known as "El Tigre," recruited him for this role. Espindola traveled to Tigre's ranch in Aguas Calientes, Mexico, where he learned how to assemble and

2

disassemble secret compartments in the interior of the passenger bus that would transport packages of heroin and methamphetamine to the United States. Espindola made his first trafficking trip to the United States with another person known as Polo, not to be confused with the defendant, whose nickname was Polivoz. They made their deliveries successfully and returned to Mexico; among their satisfied customers was an undercover DEA agent. But they learned on this trip that a busload of drugs presents logistical challenges: for example, where do you hide a bus from prying law enforcement eyes for the 5 or more hours it takes to disassemble the interior and access the traps? An open truck lot proved too nerve-wracking a locale on the first mission, so Tigre found them a safer harbor for the next: Navarro's Truck Wash.

Espindola further testified that, while en route to Cicero, IL, for the next delivery, he exchanged phone calls with Garcia, who guided him to the garage. Garcia provided Espindola with tools to open the secret compartments. Espindola, at one point, needed tape, so Garcia left to buy it for him, telling Espindola on his way out that he had the only key to the shop. Garcia also helped Espindola procure suitcases that were necessary to sort and transport the drugs once they had been extracted from the secret compartment. Garcia also bought another drill for Espindola to use when the first stopped working. When one of Fransisco Navarro's relatives tried to enter the shop the following day, Espindola called Garcia, who told Espindola not to let anyone in and that Garcia would take care of it. When it came time to deliver the first few kilograms of methamphetamine to a customer (the undercover DEA agent), Garcia facilitated the purchase of a used car at a nearby business; because of his connection to the seller, no down payment was required. With his newly purchased vehicle, Espindola went to deliver methamphetamine to his DEA customer, was arrested, and agreed to make recorded phone calls. In one of those calls, he told Tigre that he was being followed by law enforcement. Garcia and Espindola then exchanged calls in which the two

3

discussed how best to evade the police and whether the drugs were locked securely inside the bus. Garcia reiterated that only he possessed a key to the garage. When Espindola asked to enter the garage to retrieve his personal belongings, Garcia told him that "we cannot go near there." Trial Tr. Vol 3, 667:8-13.

The jury also heard from various law enforcement officers, among them Task Force Officer Ruben Carillo, who described the clandestine seizure of 48 packages of suspect narcotics from the bus while it was parked inside Navarro's Truck Wash, in addition to the 5 that he seized during Luis Espindola's arrest. Trial Tr. Vol. 2, 445:4-10. Additionally, DEA agent Blake Smith testified that he surveilled the truck wash after other agents, the night before, had seized the drugs from the bus inside. He saw a man repeatedly arriving and departing in his vehicle. At some point that day, Smith drove his pickup truck to the parking lot of the truck wash so he could get a closer look at the man he had seen coming and going. The man, whom Smith identified at trial as defendant Garcia, approached and the agent told him that he needed work done on his pickup truck, but Garcia turned him away, saying that Navarro's Truck Wash did not do that sort of work. The jury also heard from an FBI special agent on the Cellular Analysis Survey Team who testified that the defendant placed over a hundred phone calls from his cellphone in the vicinity of Navarro's Truck Wash. The government, through the testimony of Case Agent Alarcon, further demonstrated to the jury that Garcia's phone records showed the calls were placed to Luis Espindola, Fransisco Navarro, and a third co-conspirator, Jorge Hernandez.

On the third day of evidence, a juror handed a note to the Court Security Officer, which read:

> This is a question in regards to yesterday's witness. The jury got a quick explanation that 'Polo,' another individual involved in the crime, has the same name as the defendant, Luis Garcia. This occurred when the evidence of the photograph of 'Polo' was projected towards the jury and the witness on the stand answered that

4

> 'Polo' was Luis Garcia. We would, I would want to make sure that everyone is aware that that is irrelevant towards the evidence with the defendant's name listed on paper. Is there a way that could be clarified?

Trial Tr Vol. 4, 784:21–785:5. The parties agreed with the Court that the following response was appropriate, which was read in open court before all the jurors: "I have received another note asking a question about evidence that has been presented. As I told you this morning, I cannot comment on or respond to such questions. The jury's verdict may be based only on the evidence introduced at trial and on the instructions of law that the Court provides." *Id.* at 789:7-18.[1] The Court also reiterated its admonition, delivered at the start and end of every day and before every break, that the jurors not discuss the case among themselves. *Id.* at 790:6-10. Later that day, the government read into evidence the following statement:

> The parties hereby stipulate and agree as follows: Mr. Espindola–Michel did not testify in this trial that the person he knew as Polo was the defendant, Luis Garcia. Mr. Espindola–Michel testified that he met an individual whom he knew as Polo in Mexico and flew with that person in Chicago in October 2017. Mr. Espindola–Michel testified he knew the defendant, Luis Garcia, by the nickname Polivoz, and that Polo and Polivoz are two different people. The parties are unaware of Polo's real name.

---

[1] The Court had received two notes from a different juror before this one, both asking questions about the evidence. Trial Tr. Vol. 3, 531:5-13; 697:6-18. In response to the first note, the Court sent a note directly to the juror who sent the note, saying: "The Court has received your note but cannot comment on or respond to your questions. The jury's verdict may be based only on the evidence introduced at trial and the instructions of law that the court provides." *Id.* at 537:8-18. In response to the second note, the Court read a similar statement to the whole jury. Trial Tr. Vol. 4, 702:11-18. After receiving the third note (the one at issue in this motion) the Court observed, "I never received a note from a juror in any trial I participated in, directly or as a judge, where the juror was asking or making substantive commentary on the evidence entered. So I don't know why we're having this phenomenon in this trial. Every response we have given has been calculated to try to stop that, but apparently even the admonition this morning was not enough." *Id.* at 785:14-20. On the fourth day of trial, undeterred by the Court's instructions, the juror behind the first two notes submitted a third (the fourth note in total), prompting the defendant to move for her to be excused from the jury for failure to follow the Court's instructions. The government did not object, the Court granted the defendant's motion, and the juror was excused. *Id.* at 893-894.

5

The following day, the jury retired to deliberate at 1:23 PM. At 2:13, the jury sent a note to Court staff: "Hello, we need tech support." After the jurors sent this note, the Courtroom Deputy and an IT specialist went to assist and resolved the issue by showing the jurors how to operate the Jury Evidence Recording System (JERS). Trial Tr. Vol 5, 1024:15–1025:1. The next note the court received, at 4:06 PM, reported that the jury had reached a verdict. The jury found Mr. Garcia guilty on both counts.

## DISCUSSION

Federal Rule of Criminal Procedure 33(a) provides that a court may, upon the defendant's motion "vacate any judgment and grant a new trial if the interest of justice so requires." A defendant is entitled to a new trial if there is a reasonable possibility that a trial error had a prejudicial effect on the jury's verdict. *United States v. Van Eyl*, 468 F.3d 428, 436 (7th Cir 2006).

Garcia contends that the note regarding confusion between "Polo" and "Polivoz" demonstrates the jurors were improperly deliberating before the appointed time, and that the speed with which they returned the verdict is further evidence that they had been deliberating before the presentation of the evidence concluded. Garcia says that the juror's statement that "We would" like clarification about the lack of identity between Polo and Polivoz indicates that the jurors were conferring in violation of the Court's instructions. All of this, according to Garcia, violated his Sixth Amendment right to a jury trial.

The government responds that the juror's note regarding the confusion between Polo and Polivoz does not demonstrate that the jury engaged in premature deliberations, and, even if the jury had improperly deliberated early, this alone does not render Garcia's trial unfair. The jury's quick deliberation does not prove the jury had gotten a head start in improper deliberations, rather, it speaks to the overwhelming strength of the evidence against Garcia. The Court agrees.

First, juries are presumed to follow the Court's instructions, *see U.S. v. Wilbourn*, 799 F.3d 900, 913 (7th Cir. 2015), and here the Court's instruction to the jury not to discuss the case, either externally or among themselves, was emphasized repeatedly. Trial Tr. Vol. 2 at 300:25–301:16; 302:13–303:1; 418:6-11; 485:2-3; 528:22–529:2; Trial Tr. Vol. 3 at 576:1-4; 620:15-18;7 669:14-16; Trial Tr. Vol. 4 at 783:5-6; 790: 6-10; 826:3-5; 891:1-17; Trial Tr. Vol. 5 at 968:22-25. The defendant acknowledges in his brief that "at all relevant times, the jury was instructed by the Court to not deliberate until the parties had rested[.]" Def.'s Mot. at 3, ECF No. 172.

Second, the juror's use of "we" in the note is hardly conclusive evidence that the jurors were deliberating prematurely. The juror wrote, "We would, I would want to make sure that everyone is aware that that is irrelevant towards the evidence with the defendant's name listed on paper." The use of the pronoun "we" in the note, standing alone, might suggest that more than one juror had indicated some confusion about the identities of "Polo" and "Polivoz," but the juror appears to walk back that suggestion immediately by reverting to the pronoun "I." In context, the use of "we" may just as reasonably be construed as a misstatement by the juror which was immediately recognized and corrected. This explanation is all the more plausible given the fact that this note came on the heels of an admonition by the Court to all of the members of the jury not to discuss the case until it was time to deliberate. The appearance of the pronoun "we," then, cannot bear the weight Garcia loads on it to argue that his trial was unfair. A juror was apparently concerned that the similar nicknames would cause confusion among her fellow jurors; one or more other jurors may have acknowledged in some fashion their similar confusion, but it requires too great an inferential leap to conclude that the note must have come from improper, premature deliberations. Moreover, Defense counsel agreed with the Court's response at the time and did not move for a mistrial.

7

Even if the jury had discussed the subject of this note prior to deliberation, such discussions would not be grounds for a new trial. "[W]hen there are premature deliberations among jurors with no allegations of external influence on the jury, the proper *process* for jury decisionmaking has been violated, but there is no reason to doubt that the jury based its ultimate decision only on evidence formally presented at trial." *U.S. v. Morales*, 655 F.3d 608, 632 (7th Cir. 2011) (quoting *U.S. v. Resko*, 3 F.3d 684, 690 (6th Cir. 1993) (emphasis in original). In an analogous context, the Seventh Circuit has held that post-verdict interrogation of jurors regarding alleged intrajury discussion is not appropriate absent allegations of external influence. *Morales*, 655 F.3d at 632–33 (7th Cir. 2011). The adequacy of a judge's actions in response to allegations of jury misconduct are measured against the probability of bias. *Id.* at 632 (quoting *Oswald v. Bertrand*, 374 F.3d 475 (7th Cir. 2004)). As the Court observed at the time, the note did not indicate any prejudice to the defendant; to the contrary, the defense received some insight as to a potential misapprehension of evidence on the part of at least one juror. Trial Tr. Vol 4, 786:18–787:15. The misapprehension was addressed later that afternoon, when the government read into evidence a stipulation that directly addressed the lack of identity between Polo (a trafficker tangentially related to this case) and Polivoz (the nickname for defendant Luis Garcia).

Nor is the jury's relatively quick deliberation evidence of impropriety; rather, it is consistent with the government's presentation of compelling evidence supporting the charges. *See United States v. Cunningham*, 108 F.3d 120, 123–124 (7th Cir. 1997) ("The time it takes the jury to decide is not the relevant factor. The weight of the evidence is."). This was not a close case. There was ample evidence supporting the charges, as laid out above: two cooperating witnesses described the defendant's involvement in facilitating the concealment of the bus within Navarro's garage. Both these witnesses testified that Garcia maintained the only key to the establishment and

that he refused entry even to the establishment's owner. The government read transcripts of recorded phone calls in which the defendant encouraged and counseled Espindola to evade detection by the authorities. A law enforcement witness described how Garcia lingered around Navarro's Truck Wash while the bus was inside and how the defendant shooed away an ostensible customer, saying that the garage did not work on trucks. Another law enforcement witness testified regarding the seizure of 48 kilograms of drugs from the bus that was stored in the garage that only Garcia could access. All of the testimony in the case was consistent with cell phone and cell-tower location records. The most reasonable inference is that, in light of all this evidence, the jury quickly came to the conclusion that Garcia was guilty.

What's more, the jury's deliberation was not remarkably short. Garcia contends that, because the jurors retired for deliberation at 1:23 PM and asked for tech support at 2:13 PM, that they must not have been deliberating during that time. Thus, when the jurors sent the note at 4:06 PM, they had only truly deliberated for perhaps an hour and 45 minutes. First, as the government points out, it makes little sense to suppose that the jurors were not discussing the case while they waited for technical assistance with the JERS system. Second, even if they did only deliberate between roughly 2:15 and 4:00 PM, this does not impugn the quality of deliberations. The most reasonable inference is that they found the evidence strong and did not require much time to reach unanimity. *See Cunningham*, 108 F.3d at 123-24 (reversing grant of Rule 29 motion where jury had deliberated for ten minutes and emphasizing that the strength of the evidence, not the length of deliberation, is the relevant factor).

9

Case: 1:18-cr-00688 Document #: 184 Filed: 07/19/21 Page 10 of 10 PageID #:1784

\* \* \*

For these reasons, defendant Garcia's motion for a new trial is denied.

Date: July 19, 2021

John J. Tharp, Jr.
United States District Judge